## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

**DR. LISALEE D. EGBERT,**

                                         **Civ. No. 26-164**

        Plaintiff,

    v.                                    **COMPLAINT**

**THE BOARD OF REGENTS OF THE UNIVERSITY OF TEXAS SYSTEM**, acting through its component institution **THE UNIVERSITY OF TEXAS AT ARLINGTON; DR. JENNIFER COWLEY,** in her official capacity as President of the University of Texas at Arlington; and **DR. TAMARA BROWN,** in her official capacity as Provost of the University of Texas at Arlington,

        Defendants.

## <u>INTRODUCTION</u>

1.    This case is about what happens when a university recruits a Deaf professor to build a program, promises her the accommodations she needs to do her job, provides those accommodations without incident for over two years, and then, the moment she enters her critical tenure review, strips them away.

2.    Dr. Lisalee Egbert is profoundly Deaf. The University of Texas at Arlington knew this when it hired her. It promised ASL interpreter services in her offer letter. It formally

1

approved those accommodations through its ADA office. For two and a half years, the system worked.

3.    Then came January 2025. Dr. Egbert's third-year tenure review was underway, the "critical midpoint evaluation" that would determine whether she had a future at UTA. That month, UTA abruptly restricted her access to an interpreter. When she complained, things got worse: a negative evaluation one week later, denial of institutional support, and, ultimately, non-renewal of her contract—the functional equivalent of termination for a tenure-track professor—all within ten weeks of her initial complaints about the abrupt restriction on her interpreter use.

4.    The violations are ongoing. Dr. Egbert's termination takes effect May 31, 2026. Defendants Cowley and Brown have present authority to rescind the non-renewal decision and restore Dr. Egbert's accommodations, but have chosen not to do so. UTA has imposed a new, more burdensome accommodation protocol that subjects Dr. Egbert to supervisory gatekeeping of her right to communicate—a restriction no hearing faculty member faces. She seeks immediate injunctive relief before that date to preserve her position and restore the accommodations UTA promised her.

## PARTIES

5.    Dr. Lisalee D. Egbert is a Deaf woman who resides in Tarrant County, Texas. She is profoundly Deaf and communicates primarily through American Sign Language. Her deafness substantially limits major life activities including hearing, communicating, and interacting with others.

6.    The Board of Regents of The University of Texas System ("UT System") is the governing body of the University of Texas System and has the statutory authority to sue and be sued under Texas law. The University of Texas at Arlington ("UTA") is a component institution of the UT System located in Arlington, Texas. UTA receives federal financial assistance, including funding under Title IV of the Higher Education Act, 20 U.S.C. § 1070 et seq., federal research grants, and other federal funding. The UT System, acting through UTA, employs more than fifteen employees. References herein to "UTA" refer to the UT System acting through its component institution, The University of Texas at Arlington.

7.    Dr. Jennifer Cowley is UTA's President and has ultimate authority over personnel decisions and institutional policy at UTA. Dr. Tamara Brown is UTA's Provost and approved the non-renewal of Dr. Egbert's contract on April 10, 2025. Both are officials of UTA responsible for the administration of its academic programs and personnel decisions. Both have present authority to rescind the non-renewal decision and reinstate Dr. Egbert with full accommodations. Both have been made aware of Dr. Egbert's discrimination and retaliation allegations, including through the EEOC Charge of Discrimination. They are sued in their official capacities solely for prospective injunctive and declaratory relief pursuant to *Ex parte Young*, 209 U.S. 123 (1908).

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this judicial district.

9.      Dr. Egbert timely filed a Charge of Discrimination with the EEOC alleging disability discrimination, failure to accommodate, and retaliation. The EEOC issued a Notice of Right to Sue on November 18, 2025. This Complaint is filed within ninety days of receipt of that notice. All claims asserted herein are like or related to the allegations contained in the EEOC charge, or could reasonably be expected to grow out of the EEOC's investigation of the charge.

10.     UTA is sued under Section 504 of the Rehabilitation Act for all available relief, including monetary damages. UTA waived its sovereign immunity as to claims under Section 504 by accepting federal financial assistance. 42 U.S.C. § 2000d-7(a)(1). Defendants Cowley and Brown are sued in their official capacities for prospective injunctive and declaratory relief under the Americans with Disabilities Act.

## FACTS

### I. UTA Recruits Dr. Egbert and Promises Accommodations

11.     In 2022, UTA recruited Dr. Egbert—a highly qualified Deaf academic with a doctorate in Deaf Studies and Deaf Education—to develop and lead its American Sign Language program in the Modern Languages Department.

12.     Dr. Egbert was hired on a six-year tenure-track contract, later extended by one year due to the COVID-19 pandemic. Her third-year review was thus the true midpoint of a seven-year tenure clock—not the endpoint of a probationary period. UTA's decision to terminate her at the midpoint cut short the timeline UTA itself had established and denied her the

opportunity to develop her research portfolio over the full period UTA had established for the tenure track.

13.    UTA knew Dr. Egbert was Deaf. Her offer letter explicitly acknowledged her need for interpreter services, stating that UTA would "provide ASL interpreters for her as a faculty member . . . to the extent required under the ADA as a reasonable accommodation."

14.    Dean Dan Cavanagh specifically acknowledged that scholarship in the Deaf community takes different forms, assuring Dr. Egbert that presentations at Deaf Conferences would receive appropriate weight in evaluating her scholarly contributions.

15.    Dr. Egbert completed UTA's ADA accommodation process. On June 16, 2022, she participated in an interactive process meeting. On August 15, 2022, UTA's ADA office issued a formal Accommodation Decision Letter approving interpreter services and other accommodations.

16.    As a tenure-track professor, Dr. Egbert's essential job functions include teaching, research, service, participating in faculty governance, and engaging in the tenure review process. Because she is Deaf, she requires ASL interpreters to perform each of these functions. With interpreters, she is fully qualified to perform all essential functions of her position.

*II. Dr. Egbert Builds UTA's ASL Program from the Ground Up*

17.   When Dr. Egbert arrived, she discovered that UTA's ASL program existed in name only—there was no structured curriculum or course materials. She built everything from scratch.

18.   Dr. Egbert developed all course materials and curriculum, single-handedly established the ASL & Deaf Studies minor, and won a grant for eight Open Educational Resource courses. She developed relationships with Tarrant County College and San Antonio College for program collaboration, collaborated on a major international grant with UTA's Russian department, and was invited to present at the International Deaf Academic Research Conference.

19.   Dr. Egbert's teaching was exemplary. In November 2024, Dr. Alicia Rueda-Acedo, the Spanish Section Head, conducted a formal peer evaluation describing Dr. Egbert's teaching as "exemplary" with "exceptionally well-organized and thoughtfully structured" lessons and "remarkable" student engagement—"one of the best instances of student progress and participation" she had observed.

20.   Department leadership told Dr. Egbert her teaching and service were "above par." The Dean wrote in her second-year review: "Dr. Egbert's service and teaching are both to be commended."

21.   Dr. Egbert's annual evaluations reflected consistent progress. In her first year, her research was rated "beyond expectations." In her second year, her research was rated "acceptable." At no point during these first two years was Dr. Egbert told her research was deficient or

that her tenure prospects were in jeopardy. It was only in her third year—after she complained about the restriction of her interpreter accommodations—that UTA claimed her research was inadequate. On information and belief, the negative third-year research assessment was retaliatory and does not reflect a good-faith evaluation of Dr. Egbert's scholarly contributions.

22.    The purported research deficiency was pretextual. UTA hired Dr. Egbert to build an entirely new program. In her first two years, she necessarily devoted substantial time to developing curriculum, establishing the ASL & Deaf Studies minor, creating course materials that did not previously exist, and building institutional relationships—work that UTA's own evaluators rated "beyond expectations" in year one and "acceptable" in year two. Neither rating suggested deficiency. No evaluator told Dr. Egbert her research was inadequate or that her tenure prospects were in jeopardy until after she complained about the restriction of her accommodations. On information and belief, the negative third-year evaluation was manufactured to provide a facially neutral basis for a termination decision that was actually motivated by the cost of Dr. Egbert's interpreter accommodations and by retaliation for her complaints about the restriction of those accommodations.

### III. Accommodations Work Without Issue for Over Two Years

23.    From August 2022 through late 2024, Dr. Egbert's interpreter accommodations functioned without incident. UTA never claimed any burden. The prior Dean assured her that

interpreting expenses would be fully supported. No one told Dr. Egbert to limit or vet interpreter scheduling.

24.     Dr. Egbert arranged interpreters to participate in teaching, meetings, professional development, and university events—everything a hearing professor does, except that she needed interpreters to do it. Hearing faculty are not required to ration their participation, are not denied attendance at meetings or events, and are not subject to budget caps on their ability to communicate.

25.     UTA—a major research university with substantial federal funding—never claimed that providing interpreter services constituted an undue hardship.

### IV. Everything Changes During Dr. Egbert's Tenure Review

26.     Dr. Egbert's third-year tenure review took place during the 2024–2025 academic year. UTA's own policy describes this as a "critical midpoint evaluation" that determines a faculty member's trajectory toward tenure.

27.     On January 31, 2025—precisely as this critical review was underway—UTA abruptly restricted Dr. Egbert's interpreter access, requiring her to share limited funds with another Deaf faculty member. The restrictions came without warning after two years of the system working.

28.     That same day, Dr. Egbert contacted HR and the ADA coordinator seeking assistance. The ADA coordinator did not respond for sixty-one days—well after the non-renewal decision was made.

29.     UTA never engaged in good faith discussions before imposing restrictions. Dr. Egbert attempted multiple times to collaborate on prioritizing interpreter usage. Her efforts were rejected or ignored. When she finally received budget information in March 2025, she was told only $12,000 remained for the semester—to be shared with another Deaf faculty member—and that UTA was already over budget. This amount was insufficient to cover even the minimal meetings Dr. Egbert was required to attend, including mandatory department meetings. UTA had effectively made it impossible for Dr. Egbert to perform her job duties for the remainder of the academic year. Any breakdown in the interactive process was caused solely by UTA.

30.     The restriction and elimination of Dr. Egbert's interpreter services denied her a fair tenure review process. Without interpreters, Dr. Egbert could not meet with evaluators, respond to criticisms of her work, consult with Faculty Affairs about her research progress, meet with the ombudsman, or advocate for herself before the committee and administration. The accommodation denial ensured that Dr. Egbert could not defend against or rebut the negative evaluation—an evaluation that, on information and belief, was itself retaliatory. UTA denied Dr. Egbert the tools to participate in her own review, then used the outcome of that compromised review to justify her termination.

## *V. Swift Retaliation Follows Dr. Egbert's Complaints*

31.  The sequence of events that followed Dr. Egbert's January 31 complaints was swift and devastating:

  - **Day 3 (February 3):** The department chair sent Dr. Egbert a written communication explicitly blending interpreter restrictions with her tenure review. UTA's Chief Legal Officer later acknowledged this connection, admitting: "I'm not sure how the chair could always keep separate the issue of interpreters and meetings."

  - **Day 7 (February 7):** Dr. Egbert was alerted to a "problem" with her evaluation— exactly one week after her complaints. On information and belief, the evaluation process was not yet finalized as of January 31, 2025, and the negative assessment was influenced by the department chair's February 3 communication, which had already conflated the interpreter dispute with Dr. Egbert's tenure review.

  - **Days 12–14 (February 12–14):** Dr. Egbert sought help from Faculty Affairs as her committee chair had instructed. Faculty Affairs refused, claiming a "conflict of interest"—despite such assistance being a standard function of that office.

  - **Day 17 (February 17):** Dr. Egbert met with Vice Provost Minerva Cordero regarding her research progress. Vice Provost Cordero refused to call to verify whether an interpreter was available for the meeting. When Dr. Egbert explained that she had previously reached out to Faculty Affairs to ensure her research was

on track, Vice Provost Cordero informed her that the faculty affairs staff members she had consulted no longer worked at UTA. Vice Provost Cordero acknowledged that the failure of Faculty Affairs staff to respond to Dr. Egbert's prior emails was "not acceptable," yet offered no remedy.

- **Day 19 (February 19):** Dr. Egbert tried to meet with the ombudsman. The meeting could not occur because UTA did not provide an interpreter.

- **Day 24 (February 24):** Told only $6,000 remained for interpreters, Dr. Egbert wrote to the chair: "Never would the university ask/tell for a hearing professor on campus not to attend events or cut out work. This is discrimination and under the ADA and the Rehabilitation Act, it is my right to have interpreting services."

- **Day 47 (March 19):** All interpreter funds depleted. Dr. Egbert could no longer participate fully in university activities or advocate for her tenure case.

- **Day 61 (April 2):** The ADA coordinator finally responded to Dr. Egbert's January 31 request—after the damage was done.

- **Day 69 (April 10):** Provost Brown approved the non-renewal of Dr. Egbert's contract. Her termination date: May 31, 2026.

32.    The temporal proximity—measured in days, not months—between Dr. Egbert's protected activity and each adverse action establishes a causal connection. The chair's February 3 communication provides direct evidence of retaliatory motive. On information and belief, the individuals responsible for the non-renewal recommendation, including administrators above the department level, were aware of Dr. Egbert's January 31 complaints about the restriction of her accommodations and her February 24 invocation of the ADA and Rehabilitation Act at the time the recommendation was made. Dr. Egbert would not have been subjected to a negative evaluation, denied institutional support, or terminated but for her complaints about the restriction of her accommodations and her invocation of her rights under the ADA and the Rehabilitation Act.

## VI. UTA's Shifting Rationales Reveal Pretext

33.    UTA's explanations have shifted repeatedly. Its Chief Legal Officer first claimed Dr. Egbert "did not initially go through the required ADA accommodation process" and "just scheduled her own interpreters whenever she wanted."

34.    This was false. UTA's own August 15, 2022 ADA Accommodation Decision Letter proves Dr. Egbert completed the process. When confronted with this document, the Chief Legal Officer offered no explanation for the prior false statement.

35.    UTA also claimed Dr. Egbert "failed to attend" meetings for which interpreters were scheduled. In fact, Dr. Egbert attended all meetings she personally scheduled. On April 15,

2025, interpreters texted her seeking directions for a meeting—the first she had heard of it. UTA had scheduled a meeting in her name without telling her, then blamed her for not attending.

36.     UTA cited as "excessive" that Dr. Egbert scheduled an interpreter for a graduation ceremony "even though there were already interpreters present." But the stage interpreters were for the audience, not positioned to help Dr. Egbert interact with colleagues, students, and families as a participating faculty member. That UTA considered this request excessive reveals how little it understood about effective accommodations.

37.     Notably, Dr. Egbert's own department leadership did not support her termination. The department chair and assistant chair both told Dr. Egbert that it was common for faculty in the Modern Languages Department to transition from tenure-track to clinical-track positions, and that both of them had reached out to the Dean requesting that UTA find a way to retain Dr. Egbert at the university. This is significant in three respects. First, the non-renewal recommendation did not originate with Dr. Egbert's direct supervisors—the people best positioned to evaluate her day-to-day performance; it came from higher in UTA's administrative hierarchy. On information and belief, the pressure to terminate Dr. Egbert originated with administrators who viewed the cost of her interpreter accommodations as a budgetary problem to be eliminated rather than a legal obligation to be met. Second, that the department chair sent the February 3 communication blending interpreter restrictions with the tenure review, while at the same time privately advocating for Dr. Egbert's retention, suggests the chair was acting under institutional pressure from

administrators who had their own reasons for wanting Dr. Egbert gone. Third, UTA had available a less drastic alternative: transitioning Dr. Egbert to a clinical-track position, as it had done for other faculty in the same department. UTA's decision to bypass that option and instead terminate Dr. Egbert entirely is further evidence that the non-renewal was motivated by a desire to eliminate the cost of her accommodations rather than by legitimate performance concerns. A clinical-track professor would still need interpreter accommodations; only termination would eliminate the expense.

38.    The pattern of shifting explanations is itself evidence of pretext. UTA's story changed from "she didn't follow the ADA process" to "she scheduled too many interpreters" to "she missed meetings we scheduled without telling her" to "her research was weak anyway." When an employer's justification keeps changing, it suggests the stated reasons are not the real reasons. The common thread running through every one of UTA's actions—restricting interpreter access, imposing budget caps, characterizing accommodation requests as "excessive," and ultimately terminating Dr. Egbert—is cost. Each action served to reduce or eliminate the expense of accommodating a Deaf professor. At no point has UTA articulated a consistent, legitimate, non-discriminatory reason that explains both the timing and substance of its actions.

## VI-A. The Cost of Accommodating Dr. Egbert Was the True Motivation

39.    On information and belief, UTA's decision to terminate Dr. Egbert was motivated in substantial part by its desire to eliminate the cost of her interpreter accommodations. The

evidence of cost motivation pervades the record. UTA imposed budget restrictions on interpreter services and characterized Dr. Egbert's use of those services as "excessive." Its Chief Legal Officer complained that Dr. Egbert "just scheduled her own interpreters whenever she wanted"—framing the exercise of her right to communicate as a cost problem rather than a legal obligation. UTA cited as unreasonable a single interpreter request for a graduation ceremony. It required Dr. Egbert to share limited interpreter funds with another Deaf faculty member rather than fund each professor's accommodations independently. And after Dr. Egbert complained, UTA imposed a new supervisory-approval protocol designed to restrict and reduce interpreter expenditures. Terminating an employee because the cost of accommodating her disability is inconvenient is discrimination on the basis of disability.

40.    The cost-motivation theory is further confirmed by UTA's rejection of the less drastic alternative its own department leadership proposed. The chair and assistant chair asked the Dean to retain Dr. Egbert in a clinical-track position—a role she could perform and that would preserve UTA's ASL program. UTA refused. A clinical-track professor would still need interpreter accommodations; only termination would eliminate the expense entirely. UTA's choice of the most extreme option—the only option that would end the interpreter costs—is powerful circumstantial evidence that cost, not research performance, drove the decision.

*VII. UTA Acted with Deliberate Indifference*

41.    UTA knew from Dr. Egbert's first day that she was Deaf and needed interpreters. It put this in her offer letter. It formally approved accommodations. It provided them for over two years.

42.    UTA knew Dr. Egbert's third-year review was ongoing and would determine her tenure viability. It knew that without interpreters, she could not respond to evaluations, rebut criticisms, meet with the ombudsman, or advocate for herself. The harm was not speculative—it was inevitable.

43.    Yet UTA deliberately chose to restrict her interpreter access, ignored her requests for sixty-one days, and proceeded to terminate her employment. UTA's actions evidence deliberate indifference: it had actual knowledge of a substantial risk that its conduct violated federal law and chose to proceed notwithstanding that risk.

### VIII. The Violations Are Ongoing and Dr. Egbert Faces Irreparable Harm

44.    The non-renewal decision remains in effect. Dr. Egbert's termination is scheduled for May 31, 2026. In April 2025, UTA's ADA office informed her that her previously approved accommodations would not be provided going forward. The failure to accommodate is continuing.

45.    UTA has imposed a new, more burdensome accommodation protocol during Dr. Egbert's terminal year. Dr. Egbert must now obtain the department chair's approval before she can

16

even request interpreter services. Only after the chair approves can Dr. Egbert submit a request to the scheduling system. This process eliminates any confidentiality in Dr. Egbert's accommodation requests—her professional activities, meeting schedules, and communication needs are now subject to her supervisor's review and approval. No hearing faculty member is required to seek supervisory permission before speaking to colleagues, attending meetings, or participating in university activities. This new protocol subjects Dr. Egbert to ongoing discriminatory treatment and ensures she cannot participate equally in university life during her final year.

46.     Defendants Cowley and Brown have present authority to rescind the non-renewal decision and restore Dr. Egbert's accommodations. As of the date of this Complaint, both Defendants are presently and continuously choosing not to exercise that authority, thereby perpetuating an ongoing violation of federal law. Their refusal to act is not a past, completed decision; it is a present, continuing choice that can be remedied by prospective injunctive relief.

47.     Absent injunctive relief, Dr. Egbert will lose her position, the ASL program she built, her relationships with students and colleagues, and her professional reputation. Once her position terminates, UTA may fill it, making reinstatement impossible.

## IX. Dr. Egbert's Damages

17

48.    As a result of Defendants' conduct, Dr. Egbert has suffered loss of employment, salary, and benefits; loss of future earning capacity; loss of the opportunity to earn tenure; diminished future earning capacity from reputational damage; and loss of the program she created.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Discrimination in Violation of Section 504 of the Rehabilitation Act
### 29 U.S.C. § 794
### (Against UTA)

49.    Dr. Egbert incorporates Paragraphs 1 through 48.

50.    Section 504 provides that no otherwise qualified individual with a disability shall, solely by reason of her disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance. 29 U.S.C. § 794(a). For employment discrimination claims, the standards applied under Section 504 are those of Title I of the ADA. 29 U.S.C. § 794(d).

51.    Dr. Egbert is a qualified individual with a disability. She is profoundly Deaf, which substantially limits major life activities. With reasonable accommodations, she can perform all essential functions of her position as a tenure-track professor.

52.    UTA receives federal financial assistance, including funding under Title IV of the Higher Education Act, federal research grants, and other federal funding. By accepting federal funds, UTA agreed to comply with Section 504 and waived its sovereign immunity as to claims arising thereunder. 42 U.S.C. § 2000d-7(a)(1).

53. UTA discriminated against Dr. Egbert on the basis of her disability by: (a) restricting and eliminating her interpreter accommodations during her critical tenure review; (b) subjecting her to materially different terms and conditions of employment than hearing faculty; (c) denying her the ability to participate in and defend herself during the tenure review process by restricting the accommodations necessary for her to respond to evaluations, meet with the ombudsman, and advocate for herself; (d) evaluating her performance without accounting for the denial of accommodations; (e) terminating her employment; and (f) on information and belief, making the termination decision based in substantial part on a desire to eliminate the cost of Dr. Egbert's interpreter accommodations. Hearing faculty were not subjected to equivalent restrictions on their ability to communicate and participate in university activities; the budget-based rationing of access operated exclusively against Dr. Egbert because of her disability.

54. UTA's conduct denied Dr. Egbert meaningful access to her employment and the tenure review process. Without interpreters, she could not respond to evaluations, rebut criticisms, meet with the ombudsman, attend faculty meetings, or advocate for herself.

55. UTA acted with deliberate indifference to Dr. Egbert's federally protected rights. UTA had actual knowledge of Dr. Egbert's disability and need for accommodations from the moment it recruited her. UTA acknowledged this need in her offer letter, formally approved accommodations, and provided interpreters for over two years. Despite this knowledge,

UTA deliberately chose to restrict and eliminate her interpreter services during her tenure review, knowing she could not participate equally without them.

56. UTA knew that restricting Dr. Egbert's interpreter access during her tenure review would inevitably undermine her ability to defend her case and participate in the process on equal terms. The harm was not speculative; it was certain. UTA proceeded anyway, disregarding a strong likelihood that its actions violated federal law.

57. UTA compounded its deliberate indifference by failing to inform Dr. Egbert of her right to appeal the non-renewal decision through UTA's faculty grievance committee. Despite UTA's awareness that Dr. Egbert was a Deaf employee navigating an adverse employment action without interpreter support, no administrator, HR representative, or ADA coordinator informed her that such an appeal mechanism existed or was available to her during the period when reversal of the decision might have been possible.

58. As a direct and proximate result of UTA's discrimination, Dr. Egbert has suffered damages including loss of employment, back pay, front pay, and diminished future earning capacity.

**SECOND CAUSE OF ACTION**

**Failure to Provide Reasonable Accommodations in Violation of Section 504**
**29 U.S.C. § 794; 34 C.F.R. § 104.12**
**(Against UTA)**

59. Dr. Egbert incorporates Paragraphs 1 through 48.

60.     Section 504 and its implementing regulations require recipients of federal financial assistance to make reasonable accommodation to the known physical or mental limitations of an otherwise qualified individual with a disability, unless the recipient can demonstrate that the accommodation would impose an undue hardship. 34 C.F.R. § 104.12(a).

61.     Dr. Egbert requested and was granted ASL interpreter services as a reasonable accommodation. UTA approved these accommodations on August 15, 2022, and provided them for over two years without claiming undue hardship.

62.     The previously approved interpreter services remained a reasonable accommodation at all times relevant to this Complaint. UTA has not demonstrated, and cannot demonstrate, that providing such services would impose an undue hardship. UTA is a major research university with substantial federal funding that provided interpreter services for over two years without claiming hardship.

63.     UTA failed to provide Dr. Egbert with reasonable accommodations by: (a) unilaterally restricting her interpreter access in January 2025; (b) requiring her to share limited interpreter funds with another Deaf faculty member; (c) failing to respond to her accommodation requests for sixty-one days; (d) revoking her access to the interpreter scheduling system; (e) depleting her interpreter funds; and (f) informing her that previously approved accommodations would not be provided going forward.

64.    UTA failed to engage in a good faith interactive process as required by law. UTA never consulted with Dr. Egbert before restricting her accommodations. Dr. Egbert made repeated good faith efforts to collaborate on solutions. UTA rejected or ignored those efforts. Any breakdown in the interactive process was caused solely by UTA, and that breakdown resulted in the denial of a known, available reasonable accommodation—the interpreter services UTA had previously approved and provided for over two years.

65.    UTA's sixty-one day delay in responding to Dr. Egbert's January 31, 2025 accommodation request—during the critical period of her tenure review—independently constitutes a failure to accommodate.

66.    UTA acted with deliberate indifference by knowingly failing to provide accommodations it had previously approved, ignoring Dr. Egbert's requests for over two months during her tenure review, and informing her that accommodations would not continue—all while knowing she could not perform her job without interpreters. Dr. Egbert seeks compensatory damages on this basis.

67.    As a direct and proximate result of UTA's failure to accommodate, Dr. Egbert has suffered damages.

### THIRD CAUSE OF ACTION

**Retaliation in Violation of Section 504 of the Rehabilitation Act**
**29 U.S.C. § 794(d); 42 U.S.C. § 12203**
**(Against UTA)**

68.    Dr. Egbert incorporates Paragraphs 1 through 48.

69.    Section 504(d) provides that the standards used to determine whether Section 504 has been violated in employment discrimination complaints shall be the standards applied under Title I of the ADA. 29 U.S.C. § 794(d). Those standards include the anti-retaliation provision of 42 U.S.C. § 12203.

70.    The ADA's anti-retaliation provision prohibits discrimination against any individual who opposed any act or practice made unlawful by the ADA, or who made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing. 42 U.S.C. § 12203(a). It also prohibits coercing, intimidating, threatening, or interfering with any individual in the exercise of rights protected by the ADA. 42 U.S.C. § 12203(b).

71.    By accepting federal financial assistance, UTA agreed to comply with Section 504 and its incorporated standards, including the prohibition on retaliation.

72.    Dr. Egbert engaged in protected activity by: (a) requesting and utilizing reasonable accommodations; (b) complaining to HR and the ADA coordinator on January 31, 2025, about the restriction of her accommodations; and (c) writing to the department chair on February 24, 2025, expressly invoking the ADA and Rehabilitation Act.

73.    Within days of Dr. Egbert's protected activity, UTA took materially adverse actions against her: further restricting her interpreter accommodations; issuing a negative evaluation on February 7—one week after her complaints; refusing to help her respond to the negative

evaluation; refusing to provide an interpreter for her ombudsman meeting; depleting her interpreter funds; and terminating her employment on April 10—ten weeks after her initial complaints.

74.     The close temporal proximity between Dr. Egbert's protected activity and these adverse actions—measured in days and weeks, not months—establishes a causal connection. The department chair's February 3, 2025 written communication explicitly linking interpreter restrictions to Dr. Egbert's tenure review provides direct evidence of retaliatory motive. On information and belief, the individuals responsible for the non-renewal recommendation were aware of Dr. Egbert's protected activity at the time the recommendation was made. Dr. Egbert would not have been subjected to the negative evaluation, denial of institutional support, or termination but for her protected activity.

75.     UTA's retaliation was immediate, escalating, and cumulative—moving from accommodation restrictions, to negative evaluation, to denial of support, to termination—each step following closely upon Dr. Egbert's protected complaints.

76.     UTA's retaliation was intentional.

77.     As a direct and proximate result of UTA's retaliation, Dr. Egbert has suffered damages.

## FOURTH CAUSE OF ACTION

**Discrimination in Violation of Title I of the Americans with Disabilities Act
42 U.S.C. § 12112
(Against Defendants Cowley and Brown in Their Official Capacities)**

78.   Dr. Egbert incorporates Paragraphs 1 through 48.

79.   Title I of the ADA prohibits covered employers from discriminating against a qualified individual on the basis of disability in regard to job application procedures, hiring, advancement, discharge, compensation, job training, and other terms, conditions, and privileges of employment. 42 U.S.C. § 12112(a).

80.   Dr. Egbert is a qualified individual under the ADA—a person who, with or without reasonable accommodation, can perform the essential functions of her position. 42 U.S.C. § 12111(8). With interpreter accommodations, Dr. Egbert can perform all essential functions of her position.

81.   Defendants discriminated against Dr. Egbert on the basis of her disability by restricting and eliminating her interpreter accommodations, subjecting her to different terms and conditions of employment than non-disabled employees, denying her the ability to participate in and defend herself during the tenure review process, evaluating her performance without accounting for the denial of accommodations, terminating her employment, and, on information and belief, making the termination decision based in substantial part on a desire to eliminate the cost of Dr. Egbert's interpreter accommodations.

82.   The denial of interpreter accommodations fundamentally altered the terms and conditions of Dr. Egbert's daily employment in ways that hearing faculty never experience.

83.    Defendants' discrimination was intentional.

84.    The violation of Dr. Egbert's rights is ongoing. The non-renewal decision remains in effect. Her termination is scheduled for May 31, 2026. UTA has stated that her accommodations will not be provided and has imposed the new supervisory-approval protocol described above. Defendants Cowley and Brown have present authority to rescind the non-renewal, restore accommodations, and eliminate the discriminatory supervisory-approval requirement, but are presently and continuously choosing not to do so, thereby perpetuating an ongoing violation of federal law.

85.    Dr. Egbert seeks prospective injunctive and declaratory relief against Defendants Cowley and Brown in their official capacities, including rescission of the non-renewal decision, reinstatement, and an order requiring reasonable accommodations.

86.    Dr. Egbert brings these ADA claims pursuant to *Ex parte Young*, 209 U.S. 123 (1908), solely for prospective injunctive and declaratory relief. No monetary damages are sought against Defendants Cowley and Brown.

### FIFTH CAUSE OF ACTION

**Failure to Provide Reasonable Accommodations in Violation of the ADA**
**42 U.S.C. § 12112(b)(5)**
**(Against Defendants Cowley and Brown in Their Official Capacities)**

87.    Dr. Egbert incorporates Paragraphs 1 through 48.

88.   The ADA defines discrimination to include not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability, unless the employer can demonstrate that the accommodation would impose an undue hardship. 42 U.S.C. § 12112(b)(5)(A).

89.   Defendants had knowledge of Dr. Egbert's disability and need for interpreter accommodations from the outset. UTA acknowledged this need in her offer letter and formally approved accommodations in August 2022.

90.   Defendants failed to provide reasonable accommodations by restricting and eliminating Dr. Egbert's interpreter services, failing to respond to her requests for assistance, and informing her that previously approved accommodations would not continue.

91.   Defendants failed to engage in a good faith interactive process. Dr. Egbert made repeated efforts to collaborate; Defendants rejected or ignored those efforts. Any breakdown was caused solely by Defendants, and that breakdown resulted in the denial of a known, available reasonable accommodation.

92.   Defendants have not demonstrated that providing interpreter accommodations would impose an undue hardship.

93.   Defendants' failure to accommodate was intentional.

27

94.     The failure to accommodate is ongoing and has worsened. As described in Paragraph 45, UTA has imposed a new supervisory-approval protocol that subjects Dr. Egbert's access to interpreter services to her department chair's prior approval—a gatekeeping requirement imposed on no hearing faculty member. This ongoing discriminatory protocol is presently administered under the authority of Defendants Cowley and Brown and can be eliminated by their prospective action.

95.     Dr. Egbert seeks prospective injunctive and declaratory relief against Defendants Cowley and Brown in their official capacities.

### SIXTH CAUSE OF ACTION

**Retaliation in Violation of the Americans with Disabilities Act
42 U.S.C. § 12203
(Against Defendants Cowley and Brown in Their Official Capacities)**

96.     Dr. Egbert incorporates Paragraphs 1 through 48.

97.     The ADA prohibits retaliation against any individual who has opposed any act or practice made unlawful by the ADA or who has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing. 42 U.S.C. § 12203(a). The ADA also prohibits coercing, intimidating, threatening, or interfering with any individual in the exercise of rights protected by the ADA. 42 U.S.C. § 12203(b).

98.     Dr. Egbert engaged in protected activity by requesting accommodations, complaining about accommodation restrictions to HR and the ADA coordinator on January 31, 2025,

invoking the ADA and Rehabilitation Act in writing on February 24, 2025, and filing a Charge of Discrimination with the EEOC.

99.   Dr. Egbert suffered materially adverse actions: further restriction of her accommodations, a negative evaluation one week after her complaints, denial of institutional support, termination ten weeks after her complaints, and the imposition of a new discriminatory accommodation protocol during her terminal year.

100.   A causal connection exists between Dr. Egbert's protected activity and the adverse actions. The temporal proximity of days to weeks establishes an inference of causation. The department chair's February 3, 2025 communication explicitly linking interpreter issues to tenure review provides direct evidence of retaliatory motive. On information and belief, the individuals responsible for the non-renewal recommendation were aware of Dr. Egbert's protected activity at the time the recommendation was made. Dr. Egbert would not have been subjected to the adverse actions described herein but for her protected activity.

101.   Defendants' retaliation was immediate, escalating, cumulative, and designed to deter Dr. Egbert from asserting her federally protected rights.

102.   The retaliation is ongoing. The non-renewal decision remains in effect and will result in Dr. Egbert's termination on May 31, 2026 unless rescinded. The discriminatory supervisory-approval protocol continues to punish Dr. Egbert for asserting her rights.

Defendants Cowley and Brown have present authority to rescind the non-renewal, restore accommodations, and eliminate the retaliatory protocol, but are presently and continuously choosing not to do so.

103.   Dr. Egbert seeks prospective injunctive and declaratory relief against Defendants Cowley and Brown in their official capacities to remedy this ongoing violation. No monetary damages are sought against Defendants Cowley and Brown.

## PRAYER FOR RELIEF

WHEREFORE, Dr. Egbert respectfully requests that this Court:

*Injunctive Relief (Pursuant to the ADA, Against Defendants Cowley and Brown)*

A. Enter a preliminary injunction rescinding the non-renewal decision and reinstating Dr. Egbert to her tenure-track position with full accommodations pending resolution of this action;

B. Enter a permanent injunction:

(i) Rescinding the non-renewal decision;

(ii) Reinstating Dr. Egbert to her tenure-track position with credit for years of service;

(iii) Restoring the pre-January 31, 2025 accommodation framework and eliminating the supervisory-approval protocol;

(iv) Prohibiting future budget caps on interpreter services without individualized undue hardship assessment;

(v) Requiring ADA training for decisionmakers involved in accommodation and tenure decisions; and

(vi) Enjoining Defendants from further discrimination and retaliation against Dr. Egbert;

***Declaratory Relief***

C. Enter a declaratory judgment that Defendants violated Section 504 of the Rehabilitation Act and the Americans with Disabilities Act by discriminating against Dr. Egbert, failing to accommodate her disability, and retaliating against her for exercising her federally protected rights;

***Monetary Relief* (Pursuant to Section 504 of the Rehabilitation Act, Against the Board of Regents of The University of Texas System)**

D. To the extent Defendants terminate Dr. Egbert's employment, Award Dr. Egbert back pay, including lost wages, salary, and benefits, with prejudgment interest;

E. Award Dr. Egbert front pay in lieu of reinstatement if reinstatement is not feasible;

F. Award Dr. Egbert compensatory damages for pecuniary losses, including out-of-pocket expenses, diminished future earning capacity resulting from damage to her professional reputation, and loss of career opportunities;

***Attorneys' Fees and Costs***

G. Award Dr. Egbert reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 794a and 42 U.S.C. § 12205;

H. Award Dr. Egbert pre-judgment and post-judgment interest as permitted by law; and

***Other Relief***

I. Nominal Damages

J. Grant such other and further relief as this Court deems just and proper.

## **<u>JURY DEMAND</u>**

Dr. Egbert demands a trial by jury on all issues so triable.

Dated: February 15, 2026

                                                                Respectfully submitted,

                                                                **EISENBERG & BAUM, LLP**

                                                                <u>/s/Andrew Rozynski</u>
                                                                Andrew Rozynski, Esq. (NY#505446)
                                                                24 Union Square East, Penthouse
                                                                New York, NY 10003
                                                                Telephone: (212) 353-8700
                                                                Fax: (917) 591-2875
                                                                arozynski@eandblaw.com
                                                                *Attorneys for Plaintiffs*